UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DENNIS MICHAEL MINTUN,<br><br>                    Plaintiff,<br><br>v.<br><br>TYRELL DAVIS; JENNIFER TYVAND; SGT. HAMMER; LT. COREY SEELY; and JEFF KIRKMAN,<br><br>                    Defendants. | Case No. 1:23-cv-00427-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff Dennis Michael Mintun is a prisoner in the custody of the Idaho Department of Correction ("IDOC"), currently incarcerated at the Idaho State Correctional Center. The events giving rise to Plaintiff's claims occurred while Plaintiff was incarcerated at a different Idaho prison, the Idaho State Correctional Institution ("ISCI"). Plaintiff is proceeding pro se and in forma pauperis in this civil rights matter. The operative complaint in this case is Plaintiff's Amended Complaint (Dkt. 9), filed on February 26, 2024.

As set forth in the factual recitation below, as a result of the COVID-19 pandemic, from June 2020 to May 2022, ISCI instituted a total ban on group religious worship services. From May to September 2022, the prison permitted the chapel to be used by volunteer-led religious groups, but not by inmate-led groups. From September 2022 to August 2023, the prison did not permit group worship for any religious groups, because

the person in charge of scheduling those services left prison employment. And from August 2023 to the present, the prison has increased the time available for group worship for all inmate religious groups—however, due to continued staffing shortages, the time available for group worship still is not yet back to pre-pandemic levels.

Plaintiff claims that these restrictions have violated his right to religious exercise. Plaintiff also claims he was removed as a religious group facilitator in retaliation for using the grievance process to complain about the chapel closures. Plaintiff has been allowed to proceed on (1) free exercise and retaliation claims under 42 U.S.C. § 1983, (2) claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq., and (3) state law claims under Idaho's Free Exercise of Religion Protected Act ("FERPA"), Idaho Code § 73-401, et seq. *Succ. Rev. Order*, Dkt. 10, at 2–3.

Defendants have filed a Motion for Summary Judgment. Defendants argue that (1) some of Plaintiff's claims are barred by the statute of limitations; (2) Plaintiff's retaliation claim fails because Plaintiff cannot show he was removed as facilitator on account of his protected activity; (3) Plaintiff's free exercise claims fail because the COVID-19 restrictions on group worship services were reasonably related to a legitimate penological interest; (4) Plaintiff's RLUIPA claims in Defendants' individual capacities are not cognizable; (5) Defendants are entitled to qualified immunity on Plaintiff's federal claims; (6) Plaintiff's damages claims under § 1983, RLUIPA, and FERPA are barred by the Eleventh Amendment; and (7) Plaintiff's claims for injunctive relief under § 1983, RLUIPA, and FERPA are moot, and the Court cannot issue injunctive relief on Plaintiff's

federal claims under 18 U.S.C. § 3626. *See generally* Dkt. 22-1. The Motion for Summary Judgment is now ripe for the Court's consideration.

In addition to considering Defendants' arguments on summary judgment, the Court must dismiss a prisoner or in forma pauperis complaint at any time, on its own motion or otherwise, if a claim is frivolous or malicious, seeks monetary relief from a defendant who is immune from such relief, or fails to state a claim upon which relief may be granted. *See* 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b). A complaint fails to state a claim on which relief may be granted if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard is met when a complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but a plaintiff must offer "more than … unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," or if there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a plausible claim for relief. *Id.* at 678, 682 (internal quotation marks omitted). Bare allegations amounting to a mere restatement of the elements of a cause of action, without adequate factual support, are not enough.

Having carefully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that oral argument is

unnecessary. *See* D. Idaho Loc. Civ. R. 7.1(d). Accordingly, and for the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment.

## STANDARD OF LAW GOVERNING SUMMARY JUDGMENT

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

In resolving a summary judgment motion, the Court must consider the facts in the light most favorable to the non-moving party, unless the non-moving party's version of the facts is "blatantly contradicted by the record[] so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If such a blatant contradiction exists, then there is no "genuine" dispute as to that fact. *Id*.

The moving party bears the initial burden to show that each material fact cannot be disputed. Material facts are those "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Id*. at 247–48. Rather, a case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact.

To show that the material facts are not in dispute, the moving party may cite to particular parts of materials in the record or show that the nonmoving party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). Where, as here, the party moving for summary judgment would not bear the burden of proof at trial, that party may prevail simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

If the moving party meets this initial responsibility, the burden then shifts to the non-moving party to establish that a genuine dispute as to any material fact does indeed exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Instead, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

The Court must consider "the cited materials" in considering a motion for summary judgment, but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Rather, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

That is, "if a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter

by producing evidence of his or her own." *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). In opposing a motion for summary judgment, the non-moving party must submit at least "some competent evidence," such as a "declaration, affidavit, [or] authenticated document," to support his allegations or to dispute the moving party's allegations. *Soto v. Sweetman*, 882 F.3d 865, 872–73 (9th Cir. 2018) (upholding grant of summary judgment against pro se inmate because the "only statements supporting [plaintiff's] ... argument are in his unsworn district court responses to the defendants' motion for summary judgment and to the district court's show-cause order"). If the non-moving party fails to produce such evidence, or if the evidence produced is insufficient, the Court "is not required (or even allowed) to assume the truth of the challenged allegations in the complaint." *Butler*, 370 F.3d at 963.

Affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact" to survive summary judgment. *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997), *as amended* (Apr. 11, 1997). In determining admissibility for summary judgment purposes, it is the content of the evidence, rather than its form, that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court must grant summary judgment for the moving party "if the

motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

Statements in a brief, unsupported by the record, cannot be used to create a dispute of fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). The Ninth Circuit has "repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Beyene v. Coleman Sec. Services, Inc.,* 854 F.2d 1179, 1182 (9th Cir. 1988) (internal quotation marks omitted). Authentication, required by Federal Rule of Evidence 901(a), is not satisfied simply by attaching a document to an affidavit. *Id.* The affidavit must contain "testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document." *Id*.

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences which can be drawn from the evidence must be drawn in the light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630–31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

In cases involving pro se inmates, courts liberally construe the pleadings and briefs and "should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, although pro se inmates are exempted "from *strict* compliance with the summary judgment rules," they are not exempted "from *all* compliance." *Soto*, 882 F.3d at 872. A verified complaint by a pro se prisoner "may be treated as an affidavit to oppose summary judgment," but only "to the extent it is 'based

on personal knowledge' and 'sets forth specific facts admissible in evidence.'" *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (quoting *McElyea v. Babbitt,* 833 F.2d 196, 197–98 & n. 1 (9th Cir. 1987)).

## FACTUAL BACKGROUND

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not blatantly contradicted by clear documentary evidence in the record.[1] *See Scott*, 550 U.S. at 380.

Plaintiff is a member of the Kingdom of Erotes – Greek Pagan Path ("KOE"), a small religious group that Plaintiff founded in 2008. *Decl. of Dennis Mintun* ("*Mintun Decl.*"), Dkt. 24 at ECF p.5. The patron deities of the KOE are Eros and Aphrodite, and the group "also worship[s] other gods and goddesses of Greek origin." *Id*. Group worship is "an integral part" of the KOE because the group "relies on the shared spiritual energy of the membership." *Id*. at ECF p.6.

"ISCI is a 1,446-bed, medium-security men's prison located south of Boise." *Defs' Stmt. of Undisp. Mat. Facts* ("*SUMF*") ¶ 1. Inmates at ISCI represent more than ten religious groups, many of which have numerous denominations or subsects within them.

---

[1] Plaintiff has not submitted the required statement of disputed material facts. *See* Dist. Idaho Loc. Civ. R. 7.1(c)(2) ("In responding to a motion for summary judgment under Federal Rule of Civil Procedure 56, in addition to the requirements contained in Federal Rule of Civil Procedure 56(c)(1), the responding party must also file a separate statement … of all material facts which the responding party contends are in dispute."). Mindful of Plaintiff's pro se status, the Court declines to strike Plaintiff's response to the Motion for Summary Judgment for failure to comply with Rule 7.1(c)(2).

ISCI has a chapel that different inmate religious groups can use to congregate and worship together. The chapel is also used for non-religious classes such as guitar lessons. In addition to the chapel, the prison has an outdoor worship area ("OWA") for inmate use. "The OWA is divided in half with one half dedicated to a sweat lodge for use by Native American religious groups," and the other half "primarily used by KOE, the Odinists, and the Astral Oaken Grove" religious groups. *Id*. ¶ 2.

Plaintiff has acted as a facilitator for the KOE religious group. A "religious group facilitator is an informal designation given to an inmate who is responsible for communicating needs of the group to the institution and for scheduling the group's use of the chapel and outdoor worship areas." *Id*. ¶ 14.

ISCI's Volunteer and Religious Activity Coordinator ("VRC") manages the day-to-day religious services and volunteers. However, the Warden and Deputy Warden of the prison "maintain ultimate responsibility to ensure that IDOC policies with respect to religious activities are adhered to." *Id*. ¶ 3.

Because both the chapel and the OWA are used by many different inmate religious groups, as well as secular groups, the "typical process to schedule either the chapel or the OWA is simply for an individual (usually a group facilitator) to meet with the VRC to find and schedule an available time for the particular group …. Once a group is scheduled, the VRC posts the schedule," and inmates then submit a form asking to attend their desired service. Inmates are "added to the daily callout for all activities in the chapel or OWA so that they can then attend their services or classes at the appropriate time." *Id*. ¶ 4.

MEMORANDUM DECISION AND ORDER - 9

Prior to the COVID-19 pandemic, the KOE Greek Pagan Path was able to meet for group worship services for six hours per week in the chapel and for nine to twelve hours per month at the OWA. *Am. Compl.* at 2.

First beginning in late 2019, and for most of 2020, 2021, 2022, and 2023, the world faced an unprecedented global pandemic caused by the coronavirus. COVID-19 is a respiratory illness "that spreads through small liquid particles" and, therefore, "posed unique risks [of] infection in confined spaces, including prisons such as ISCI." *SUMF* ¶ 5. Many churches and other houses of worship across the country and the world closed during the height of the pandemic. Some states prohibited gatherings, including religious gatherings, of more than a certain number of people.

Like many entities and businesses, ISCI "experienced significant staffing shortages" as a result of the pandemic. *Id*. ISCI was unable to fill open positions, leaving ISCI's filled positions at a mere 63% of full staffing levels. In addition, existing prison employees' absences from work increased when employees contracted COVID-19. *Id*. ¶ 6.

In June 2020, ISCI staffing fell to emergency levels—due to both unfilled correctional officer positions and staff illness from COVID-19—which "created direct threats to prison safety." *Id*. ¶ 6. Because of both the "severe staff shortages and ongoing risks of infection related to COVID-19," prison officials decided to close both the chapel and the OWA—for both religious and nonreligious purposes. This complete closure remained in place until May 2022. Not only did prison officials believe the closures were necessary because of the "obvious health risks" of large groups of inmates in close, confined quarters, but also because the staffing shortage "implicated concerns about, for

example, limited ability to address increased risks of fights, the movement of contraband, or other violations of prison policy that could undermine staff and inmate safety." *Id.* ¶ 7. While the chapel and OWA were closed, inmates generally had "alternative means to practice their religions," such as "self-study and prayer and by having access to religious literature upon request." *Id.* ¶ 8. However, Plaintiff states that, in addition to the restriction on group worship services, KOE literature and "altar items" went missing during the pandemic. *Mintun Decl.* at ECF p.8.

Plaintiff acknowledges that, at least for some period of time beginning in June 2020, the ban on group worship services was justified by the pandemic. But Plaintiff claims that the restriction should have been lifted earlier than it was. *Id.* at ECF p.6.

In May 2022, the pandemic "was on a downturn," and ISCI began allowing volunteer-led religious groups to use the ISCI chapel on Tuesdays and Thursdays. Inmate-led groups, such as the KOE, were not permitted to use the chapel. Though Defendants claim that inmate-led groups were permitted to use the OWA, Plaintiff disputes this statement, alleging that inmate-led groups were not permitted use either the chapel or the OWA. Prison officials made the decision to keep the chapel closed to inmate-led groups, but not volunteer-led groups, based on "staff and resident security" needs because prison policy requires more staff supervision for inmate-led groups than for volunteer-led groups. *SUMF* ¶¶ 9–10.

In September 2022, the VRC left due to a lapse in IDOC's contract, and the VRC position went unfilled for approximately nine months. Because the VRC was the person "charged with scheduling the worship areas and monitoring religious groups while using

the OWA," no religious groups were able to access the chapel or the OWA from September 2022 to August 2023. ISCI also continued to suffer a "severe staffing shortage" during this time. *Id*. ¶ 11.

In August 2023, because the threat of the pandemic was waning and because the VRC position had been filled, the chapel and OWA "were reopened to all religious groups."[2] But because staffing levels had not yet "rebounded to the pre-pandemic levels, use of the chapel and OWA was still semi-limited in so far as the total amount of hours available per week for each group was proportionately lower than" before the pandemic. This was true with respect to all religious groups, not only the KOE. *Id*. ¶ 12. Plaintiff states that, upon the reopening of the chapel and the OWA, the KOE were permitted to gather for group worship for one-and-a-half hours per week. *Mintun Decl*. at ECF p.6.

The KOE is now permitted to use the chapel for group worship services for one hour and fifty minutes per week and the OWA for two hours and fifty minutes per month, "on a rotational basis with other pagan/wiccan groups." *SUMF* ¶ 13. Plaintiff states that, even with this amount of time set aside, "classes are often canceled for various reasons" and that the use of the OWA takes the place of one chapel service. *Mintun Decl*. at ECF p.8. This means that, each month, KOE meets for group worship—either in the chapel or the OWA—for a total of eight hours and 20 minutes.

In contrast, Plaintiff alleges that Christian inmate religious groups are allowed "over 27 hours per week" for group worship, presumably because of the greater number of

---

[2] Defendants assert that group worship services restarted in June 2023, but Plaintiff alleges it was August 2023. The Court accepts Plaintiff's timeline for purposes of this decision.

Christian denominational groups and the greater number of inmates in each of those groups, as compared to the KOE. *Id*. at ECF p.6.

In May or June 2023, Plaintiff was informed that he could no longer act as the KOE facilitator. *Id*. at ECF p.5; *SUMF* ¶ 15. According to prison officials, "[i]t is considered good correctional practice to rotate religious group facilitators in prisons to ensure that no one individual is put in a position of power for too long such that they could exert undue influence over other members of the group for inmate and staff security purposes." *SUMF* ¶ 14. The prison's "[n]ormal practice is thus to occasionally rotate the group facilitator position." *Id*. Plaintiff states that he had not heard of this practice until litigation of this case. *Mintun Decl*. at ECF p.6.

The facilitator who took over from Plaintiff in May or June 2023 allegedly ran "things poorly," resulting in lower attendance at KOE services, and "changed rules concerning the Yule feast" so that all pagan groups would attend together rather than each pagan group having their own feast. *Id*. at ECF pp. 5, 7. When Plaintiff complained, he was told by an unidentified official that his complaint "could cost [him] [his] facilitatorship again." *Id*. at ECF p.6.

Plaintiff was reappointed as the KOE religious group facilitator in September 2024. *Id*. at ECF p.5. Plaintiff remains the facilitator today. *SUMF* ¶ 15.

## DISCUSSION

### 1.    Standards of Law Applicable to Plaintiff's Claims

#### A.    *Section 1983 Claims*

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute. To state a

plausible civil rights claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). A defendant causes a constitutional deprivation within the meaning of § 1983 "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

That is, prison officials are generally not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent committed misconduct. *Taylor*, 880 F.2d at 1045.

However, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish this causal connection by alleging that a defendant (1) set in motion a series of acts by others that violated the Constitution, or knowingly refused to terminate a series of such acts, which the supervisor "knew or reasonably should have known would cause others to inflict a constitutional injury"; (2) knowingly failed to act or acted improperly "in the training,

supervision, or control of his subordinates"; (3) acquiesced in the constitutional deprivation; or (4) engaged in "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1205–09 (internal quotation marks omitted).

    i.    <u>Retaliation Claims</u>

The First Amendment includes the right to be free from retaliation for exercising constitutional rights. An inmate asserting a retaliation claim must show the following: "(1) ... that a state actor took some adverse action against the inmate (2) because of (3) that prisoner's protected conduct, ... that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) [that] the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

"[B]are allegations" of a retaliatory motive are insufficient to support a retaliation claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985); *see also Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient."). Rather, when analyzing a prison official's proffered reasons for allegedly retaliatory conduct, the Court must "afford appropriate deference and flexibility" to that official. *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (internal quotation marks omitted).

Not every retaliatory act taken by an official can be considered an adverse action that chills the exercise of protected speech. The proper inquiry asks whether the official's action "would chill or silence a person of ordinary firmness from future First Amendment activities." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)

(internal quotation marks omitted). If it would not, then "the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation marks omitted). *See also Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006) ("The [*de minimis*] standard achieves the proper balance between the need to recognize valid retaliation claims and the danger of federal courts embroiling themselves in every disciplinary act that occurs in state penal institutions.") (internal quotation marks and alteration omitted).

A plaintiff asserting a retaliation claim under § 1983 also "must show a causal connection between a defendant's retaliatory animus and [the plaintiff's] subsequent injury." *Hartman v. Moore*, 547 U.S. 250, 259 (2006) (*Bivens* action). Retaliatory motivation is not established simply by showing an adverse action by the defendant *after* protected speech. Instead, the plaintiff must show a nexus between the two. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (stating that a retaliation claim cannot rest on "the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this'"). Therefore, although the timing of an official's action can constitute circumstantial evidence of retaliation—if, for example, an adverse action was taken shortly after the official learned about an inmate's exercise of protected conduct—there generally must be something more than mere timing to support an inference of retaliatory intent. *Pratt*, 65 F.3d at 808.

The causal nexus requirement of a retaliation claim is a "but-for" causation test. If the adverse action would have been taken even without the inmate's exercise of protected conduct, the plaintiff cannot satisfy the causation element of the retaliation claim. *Hartman*,

MEMORANDUM DECISION AND ORDER - 16

547 U.S. at 260.

Finally, even if an inmate proves that his protected conduct was the but-for cause of an adverse action by a prison official, the inmate's retaliation claim fails so long as that action also reasonably advanced a legitimate penological interest. The state unquestionably has a legitimate interest in maintaining institutional order, safety, and security in its prisons, *Rizzo*, 778 F.2d at 532, and the "plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains," *Pratt*, 65 F.3d at 806.

ii.    <u>Free Exercise Claims</u>

The Free Exercise Clause of the First Amendment absolutely protects the right to believe in a religion—it does not absolutely protect all conduct associated with a religion. *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940). Inmates retain their free exercise of religion rights in prison. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). An inmate who is an adherent of a minority religion must be afforded a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). A prison need not, however, provide "identical facilities or personnel" for "every religious sect or group within a prison," and a "special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Id.* at 322 n.2.

To serve as a basis for a viable claim challenging a prison restriction under the Free Exercise Clause, an inmate's belief must be both "sincerely held" and "rooted in religious

belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (internal quotation marks omitted). Further, the burden placed on the inmate's religious exercise by the defendants' actions must be substantial. *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). *De minimis*—or minor—burdens on the free exercise of religion are not of a constitutional dimension, even if the belief upon which the exercise is based is sincerely held and rooted in religious belief. *See, e.g.*, *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (the unavailability of a non-pork tray for inmate at 3 meals out of 810 does not constitute more than a *de minimis* burden on inmate's free exercise of religion).

Challenges to prison restrictions that are alleged "to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 125 (1977) (quotation omitted). What constitutes a reasonable opportunity for religious exercise, therefore, must be evaluated within the context of a prison's need for security, among other legitimate goals. *O'Lone*, 482 U.S. at 350–53 (1987) (holding that a prison's policy of not allowing Muslim inmates on work detail to return to the prison to attend Jumu'ah, a group worship service, did not violate the Constitution).

So long as a restriction on an inmate's religious practice "is reasonably related to legitimate penological interests," that restriction is valid. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Factors to be considered in this reasonableness inquiry include (1) whether there is a logical connection between the governmental interest and the particular policy or decision at issue; (2) whether "alternative means of exercising the right remain open to prison

inmates"; (3) the impact that accommodating a prisoner's religious practice would have on "other inmates, on prison personnel, and on allocation of prison resources generally"; and (4) whether there is an absence of "obvious, easy alternatives" to the policy or decision. *O'Lone*, 482 U.S. at 350–53 (internal quotation marks and alterations omitted). Courts must take care to avoid "substitut[ing] [their] judgment on difficult and sensitive matters of institutional administration." *Id*. at 353 (internal quotation marks and alteration omitted).

A jail or prison's occasional failure to accommodate a religious practice does not violate the Free Exercise Clause where the failures were not caused by "anything other than institutional shortage." *Wintrode v. Ada Cnty. Jail Emps.*, No. 1:24-CV-00015-DCN, 2025 WL 2374328, at *3 (D. Idaho Aug. 13, 2025) (unpublished). Similarly, a temporary delay in accommodating religious practice does not violate the First Amendment when caused by normal administrative or institutional delay. *See Tapp v. Stanley*, 2008 WL 4934592, at *7 (W.D.N.Y. Nov. 17, 2008) (unpublished) (holding that a 3-month delay in providing a prisoner with a religious meal did not substantially burden the prisoner's sincerely held religious beliefs where the problem was "caused by ordinary administrative delay").

### B.   *RLUIPA Claims*

The First Amendment is not the only source of religious protection within a prison. RLUIPA provides, "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person[] (1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

An inmate asserting a claim under RLUIPA must plausibly allege that the governmental action constitutes a substantial burden on the exercise of the inmate's religious beliefs. *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). For an official's action to constitute a substantial burden on an inmate's religious exercise, it "must impose a significantly great restriction or onus upon such exercise." *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004). In determining whether an inmate's religious exercise is substantially burdened, a court may not inquire "into whether a particular belief is 'central' to a prisoner's religion." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (quoting 42 U.S.C. § 2000cc-5(7)(A)). However, "the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Id*.

If the inmate establishes "the prima facie existence" of a substantial burden on the exercise of the inmate's religion, then the burden shifts to prison officials "to prove that [the] substantial burden on [the inmate's] exercise of his religious beliefs is *both* 'in furtherance of a compelling governmental interest' *and* the 'least restrictive means of furthering that compelling governmental interest.'" *Warsoldier*, 418 F.3d at 995 (quoting 42 U.S.C. § 2000cc-1(a); § 2000cc-2(b)).

As the Supreme Court has explained,

> The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a

> substantial burden on the exercise of religion by the objecting
> party. If a less restrictive means is available for the
> Government to achieve its goals, the Government must use it.

*Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015) (internal citations, quotation marks, and alterations omitted). Prison officials or a state department of correction "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999.

Although RLUIPA is to be construed broadly in favor of protecting an inmate's religious rights, *id*., the statute does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," *Cutter*, 544 U.S. at 722. A prisoner's requests for religious accommodation must not override other significant interests within a prison setting. "Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility would be free to resist the imposition." *Cutter*, 544 U.S. at 726. In the words of the Supreme Court, "context matters." *Id*. at 723 (quotation marks and alteration omitted).

RLUIPA applies to entities receiving federal financial assistance. *Id*. at (b)(1). By accepting federal funds, however, states do not waive sovereign immunity to suits for money damages under RLUIPA. *Sossamon v. Texas*, 563 U.S. 277, 280 (2011). Further, although the statute provides for injunctive relief, RLUIPA does not allow for monetary damages against individuals. *Wood v. Yordy*, 753 F.3d 899, 902–04 (9th Cir. 2014).

### C.    FERPA Claims

FERPA is Idaho's equivalent of the federal Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, et seq. Though "Idaho has little case law interpreting the FERPA, the legislative history of the statute makes it clear that in adopting the statute the Idaho legislature intended to adopt the 'compelling interest test' contained in" the RFRA. *State v. White*, 271 P.3d 1217, 1220 (Idaho Ct. App. 2011). RFRA claims are governed by the same legal standards as RLUIPA claims. *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 436 (2006). Therefore, Plaintiffs' FERPA claims are analyzed under standards similar to those applied to RLUIPA claims.

## 2.    Restrictions Under the Prison Litigation Reform Act of 1996

Because Plaintiff is a prisoner, this case is subject to the Prison Litigation Reform Act of 1996 ("PLRA"). The PLRA was enacted "to stop federal courts from micromanaging our Nation's prisons" and "from providing more than the constitutional minimum necessary to remedy the proven violation of federal rights." Shima Baradaran-Robison, *Kaleidoscopic Consent Decrees: School Desegregation and Prison Reform Consent Decrees After the Prison Litigation Reform Act and Freeman-Dowell*, 2003 B.Y.U. L. Rev. 1333, 1351 (2003) (internal quotation marks omitted). The PLRA imposes numerous restrictions on actions challenging the constitutionality of prison conditions.

These include restrictions on prospective injunctive relief, which are codified at 18 U.S.C. § 3626. The PLRA restricts "courts' authority to issue and enforce prospective relief concerning prison conditions" and requires "that such relief be supported by findings and

precisely tailored to what is needed to remedy the violation of a federal right." *Miller v. French*, 530 U.S. 327, 347 (2000).

"If a court finds no current and ongoing violation of 'the Federal right,' the inquiry ends." *Balla v. Idaho State Bd. of Correction*, No. 1:81-CV-1165-BLW, 2020 WL 2812564, at *7 (D. Idaho May 30, 2020) (unpublished) (quoting 18 U.S.C. § 3626(b)(3)), *aff'd sub nom. Balla v. Idaho*, 29 F.4th 1019 (9th Cir. 2022). In that event, the court may not issue prospective relief. *Id*.

If a court *does* find a current and ongoing violation of federal law, it must undertake an additional analysis. Under the PLRA, a federal court may not grant or approve prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). In considering prospective injunctive relief, a court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id*.

**3.    Defendant Are Entitled to Summary Judgment**

For various reasons explained below, the Court concludes that Defendants are entitled to summary judgment on all of Plaintiff's claims.

### A.    *Plaintiff's Claims Arising Before September 27, 2021 Are Untimely*

Defendants argue that all of Plaintiff's claims that arose more than two years before the filing of the initial complaint in this case are barred by the statute of limitations. The Court agrees.

MEMORANDUM DECISION AND ORDER - 23

The statute of limitation period for filing a civil rights suit under § 1983 is the statute of limitation period for personal injuries in the state where the claim arose. *Wilson v. Garcia*, 471 U.S. 261, 280 (1985), *abrogated on other grounds by Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004). In Idaho, that limitations period is two years. Idaho Code § 5-219.

If a plaintiff cannot show that a claim accrued during the statute of limitations period, he still may file a lawsuit beyond the deadline if he can show that the statute should have been tolled (or paused) for a certain period of time during the deadline period within which he should have filed the lawsuit. Under the PLRA, the "statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process." *Brown v. Valoff,* 422 F.3d 926, 943 (9th Cir. 2005).

In addition to tolling under the PLRA, state tolling law applies to § 1983 actions unless important federal policy will be undermined. *See Johnson v. Railway Express Agency, Inc*., 421 U.S. 454, 464-65 (1975). Idaho law allows for statutory tolling of the statute of limitations for a person's juvenile status or insanity. Idaho Code § 5-230. However, because the Idaho Supreme Court has determined that "[s]tatutes of limitation in Idaho are not tolled by judicial construction but rather by the expressed language of the statute," equitable tolling is not available in Idaho. *Wilhelm v. Frampton*, 158 P.3d 310, 312 (Idaho 2007).

The doctrine of equitable *estoppel*, however, is available in Idaho. While it "does not 'extend' a statute of limitation," equitable estoppel works in a similar manner to prevent a party who has falsely represented or concealed a material fact with actual or constructive

knowledge of the truth "from pleading and utilizing the statute of limitations as a bar, although the time limit of the statute may have already run." *J.R. Simplot Co. v. Chemetics International, Inc.*, 887 P.2d 1039, 1042 (Idaho 1994), *abrogated in part on other grounds by Day as Tr. of Tr. B of Donald M. Day & Marjorie D. Day Fam. Tr. v. Transportation Dep't*, 166 Idaho 293, 301, 458 P.3d 162, 170 (Idaho 2020).

Equitable estoppel requires a showing of four elements: "(1) a false representation or concealment of a material fact with actual or constructive knowledge of the truth; (2) that the party asserting estoppel did not know or could not discover the truth; (3) that the false representation or concealment was made with the intent that it be relied upon; and (4) that the person to whom the representation was made, or from whom the facts were concealed, relied and acted upon the representation or concealment to his prejudice." *Id.*

Plaintiff filed the initial complaint in this case on September 27, 2023.[3] Therefore, Defendants have met their initial burden of showing that any claims that arose before September 27, 2021—two years before the initial complaint was filed—are time-barred. The burden thus shifts to Plaintiff to establish that he is entitled to sufficient statutory tolling or equitable estoppel. Plaintiff has not done so. Accordingly, Plaintiff's claims arising before September 27, 2021 must be dismissed as untimely.

---

[3] The initial complaint is dated September 25, 2023. However, Plaintiff is not entitled to the benefit of the mailbox rule, which generally deems a prisoner filing to be filed on the date it is delivered to prison authorities for filing by mail, *see Houston v. Lack*, 487 U.S. 266, 270–71 (1988). Because the Complaint does not include a certification that Plaintiff delivered the Complaint to such authorities on the date it was signed, *see* Dkt. 3, the initial complaint is deemed filed on the date the Court received it—September 27, 2023.

**B.    Because Plaintiff Cannot Show He Was Removed as Facilitator in Retaliation for the Exercise of Protected Conduct, and Because the Removal Was Reasonably Related to Legitimate Penological Interests, Defendants Are Entitled to Summary Judgment on Plaintiff's Retaliation Claim**

Defendants have submitted evidence that Plaintiff was not removed as facilitator because he engaged in protected activity, and—even if he was—his removal was reasonably related to legitimate penological interests. The evidence shows that the decision to remove Plaintiff was based on a practice of rotating religious group facilitators to "ensure that no one individual is put in a position of power for too long such that they could exert undue influence over other members of the group for inmate and staff security purposes." *SUMF* ¶ 14. Safety and security are unquestionably legitimate penological interests. *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 880 (9th Cir. 2002) (describing prison officials' "concern for staff safety and institutional security" as legitimate penological interests"). And rotating facilitators to ensure that no single inmate gains too much power over other inmates is reasonably related to those interests. This evidence tends to show that Plaintiff's removal was not caused by Plaintiff's exercise of protected conduct and that the removal was reasonably related to legitimate penological interests.

Thus, the burden shifts to Plaintiff to show a genuine dispute of material fact as to the reason behind his removal as facilitator and the relationship between his removal and legitimate penological interests. This Plaintiff has failed to do.

Plaintiff claims that he was told complaining could result in a future loss of facilitator status, but he does not allege that this statement was made by any named

Defendant. Accordingly, there is nothing but "mere speculation" on Plaintiff's part that Defendants removed him from the facilitator position because he engaged in protected activity. *Wood*, 753 F.3d at 905 (9th Cir. 2014). And simply because Plaintiff had not previously heard of the prison's practice of rotating facilitators does not mean that the practice did not exist or that Plaintiff's removal was not in accordance with that practice.

For these reasons, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

### C.    *The Amended Complaint Fails to State a Plausible Claim—under the Free Exercise Clause, RLUIPA, or FERPA—that, from August 2023 to the Present, the Prison's Restrictions Constituted a Substantial Burden on Plaintiff's Religious Exercise*

The Amended Complaint plausibly alleges that the total ban on inmate-led group worship services from June 2020 to August 2023 constituted a substantial burden on Plaintiff's religious exercise. *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 988 (9th Cir. 2008) ("[A]n outright ban on a particular religious exercise is a substantial burden on that religious exercise."). Plaintiff has also produced evidence to that effect. *See Mintun Decl.* at ECF p.6 ("[A]s with most spiritual paths, group worship is an integral part of the religion …. [T]he KOE relies on the shared spiritual energy of the membership."). However, the Amended Complaint does not plausibly allege—and Plaintiff has produced no evidence suggesting—that the group worship the KOE was permitted from August 2023 to the present *also* constituted a substantial burden on Plaintiff's religious exercise.

Beginning in August 2023, the prison permitted inmate-led group worship services. KOE specifically was allowed one-and-a-half hours per week for group worship, and the

inmates are now allowed one hours and fifty minutes per week. There is nothing in the Amended Complaint—or in any evidence before the Court—plausibly suggesting that this amount of time was so little as to constitute a substantial burden on Plaintiff's religious exercise.

As explained above, Plaintiff alleges that group worship is integral to his religion because its adherents rely on shared energy. Plaintiff has not, however, offered any reason to believe that two hours and fifty minutes in the OWA along with one hour and fifty minutes per week—or one-and-a-half hours per week, for that matter—is insufficient to meet his religious need. Rather, Plaintiff asserts only that this amount of time is less than that provided by the prison before the pandemic. But the fact that KOE was at one point permitted more time does not set the constitutional floor. Plaintiff, as the master of his pleading, was required to plausibly allege that the amount of time provided for group worship, once the practice was reopened, substantially burdened his religious exercise. He has not done so.

Because a substantial burden on religious exercise is a required element for all of Plaintiff's religious claims—under the Free Exercise Clause, RLUIPA, and FERPA—the failure to plausibly allege such a burden from August 2023 to the present means that these claims are subject to dismissal with respect to that time period.

This analysis does not apply to Plaintiff's claims arising from the total ban on inmate-led group worship services from June 2020 to August 2023 because the total ban *did* constitute a substantial burden. However, for the reasons explained below, Defendants still are entitled to summary judgment on those claims.

**D.** ***Because the Restrictions on Group Worship Services During the COVID-19 Pandemic Were Reasonably Related to a Legitimate Penological Interest, Defendants Are Entitled to Summary Judgment on Plaintiff's Free Exercise Claims***

There are three different restrictions and time periods at issue with respect to Plaintiff's claims: (1) the total ban on KOE group worship services from June 2020 to August 2023; (2) the one-and-a-half hours per week of KOE group worship services permitted from August 2023 to sometime before the filing of the operative complaint; and (3) the one-hour-and-fifty-minutes per week of KOE group worship services permitted from then to the present. Applying the *Turner* test, the Court concludes that each of these restrictions, during each of these time periods, was reasonably related to legitimate penological interests.

As for the first *Turner* factor, there is a rational connection between these restrictions on group worship services and the indisputably legitimate governmental interests in preventing the spread of COVID-19 and in maintaining institutional security. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) ("Stemming the spread of COVID–19 is unquestionably a compelling interest …."); *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) (stating that "maintaining internal security" is a legitimate penological interest"). Prison officials were rightfully concerned about the "obvious health risks associated with individuals being in close contact during the pandemic, … [as well as the] limited ability to address increased risks of fights, the movement of contraband, or other violations of prison policy that could undermine staff and inmate safety."). *SUMF* ¶ 7. Given that COVID-19 spreads quickly and easily to individuals in close proximity to

one another, and given that ISCI's staffing levels were so low, temporarily ceasing group worship services or limiting those services to one or two services per week "logically advances" legitimate penological interests. *Turner*, 482 U.S. at 93; *see also Ramsey v. Stewart*, 232 F.3d 896 (9th Cir. 2000) (Table) (unpublished) ("[H]aving one Muslim service is reasonably related to the legitimate penological interests of maintaining safety and security, given the limits of prison staff and resources.").

The second *Turner* factor—whether alternative means exist for an inmate to engage in religious exercise—is a closer question. "The relevant inquiry … is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, we are to determine whether the inmates have been denied all means of religious expression." *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993).

Plaintiff was permitted to engage in religious worship in his cell, so he was not denied all means of religious expression. However, Plaintiff's evidence establishes that group worship, not only individual worship, is integral to KOE's religious practices. From August 2023 to the present, KOE was permitted group worship services, and therefore this factor weighs in favor of Defendants. However, during the total ban on group services from June 2020 to August 2023, this factor weighs in favor of Plaintiff.

The third factor identified in *Turner* is the impact that accommodation of Plaintiff's desire for KOE group worship would have had on guards, other inmates, and the general allocation of prison resources. 482 U.S. at 90. This factor unquestionably weighs in favor of prison officials. Permitting group worship services during the pandemic would have resulted in even more inmates and correctional officers contracting COVID-19. This would

only have increased the staffing shortage at the prison and heightened the health and security problems caused by the pandemic.

The final *Turner* factor, whether there were alternative means of advancing legitimate penological interests, also favors Defendants. Though Plaintiff argues that prison officials could have permitted inmates to use the OWA instead of the chapel during the total ban on group services from June 2020 to August 2023, the lack of adequate prison staffing made this impractical. *SUMF* ¶ 6 ("[U]nfilled correctional officer positions and other staff contracting COVID" created "direct threats to prison safety"). The pandemic and its resulting staff shortages, as well as staff and inmate illness, required the implementation of "restricted recreation schedules, closing the ISCI education building, and closing other areas to be determined as prison resources were in flux." *Id*.

Defendants have met their initial burden of establishing that the restrictions on group worship services were reasonably related to legitimate penological interests. The burden thus shifts to Plaintiff to show a genuine dispute of material fact regarding the *Turner* factors. Plaintiff has not done so.

Plaintiff asserts that the KOE group is permitted less group worship time than Christian groups. But the Free Exercise Clause is not violated by the mere fact that other, larger religious groups have more opportunities for group worship than the KOE. *See Cruz*, 405 U.S. at 322 n.2 (stating that, although "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s]," not "every religious sect or group within a prison—however few in

number—must" be provided the same number or type of facilities or personnel as other groups).

Finally, even if Plaintiff could prove that the restrictions on group worship services were not reasonably related to legitimate penological interests, Defendants still would be entitled to qualified immunity, as explained below.

### E.    Defendants Are Entitled to Summary Judgment on Plaintiff's Free Exercise and RLUIPA Claims on the Basis of Qualified Immunity

The doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (internal quotation marks omitted). Qualified immunity is a defense both to constitutional claims and to statutory claims, such as claims under RLUIPA. *Lovelace v. Lee*, 472 F.3d 174, 198–99 (9th Cir. 2006).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the [defendant's] conduct violated a constitutional right"; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223 (2009). Addressing the two prongs of the test in this order is often beneficial,

but it is not mandatory. Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. If a defendant meets their initial burden on summary judgment, then a plaintiff can avoid summary judgment on qualified immunity grounds only by showing that there was a violation of a constitutional right *and* that the right was clearly established.

A district court may exercise its discretion to analyze the qualified immunity prongs in either order, and the resolution of the second prong may obviate the need to address the first. *Id.* To determine whether the right at issue was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act. *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent, the district courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *Id.* The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.

If a court determines that the constitutional right at issue was, in fact, clearly established, the court must then consider whether—*despite* the clearly-established nature of the right—a reasonable prison official still "could have believed the [challenged] conduct was lawful." *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995). A prison official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that *any* reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (emphasis added). "The relevant, dispositive inquiry is whether it would be clear to

a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Saucier*, 533 U.S. at 202 (emphasis added).

Application of qualified immunity is appropriate where "the law did not put the [defendant] on notice that his conduct would be clearly unlawful." *Saucier*, 533 U.S. at 201. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not necessary that the "very action in question has previously been held unlawful, but … in the light of preexisting law the unlawfulness must be apparent" to the official. *Id*. (internal citations omitted).

For an official to be denied qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). That is, to show that a right is clearly established, a plaintiff must "*identify a case* where an officer acting under similar circumstances as defendants was held to have violated" the right at issue. *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (alteration omitted). If no case so holds, then it cannot be said that the defendant "acted unreasonably in these circumstances," and the defendant is entitled to qualified immunity. *Mullenix v. Luna*, 577 U.S. 7, 14 (2015).

As set forth above with respect to Plaintiff's free exercise, RLUIPA, and FERPA claims, the total ban on group services from June 2020 to August 2023 constituted a substantial burden on Plaintiff's religious exercise. And the prison's interests in limiting the spread of COVID-19 and in maintaining institutional safety and security are compelling. However, the Court will assume, without deciding, that the total ban on group

worship services was not the least restrictive means of furthering those interests as required by RLUIPA.

Nonetheless, Defendants are entitled to qualified immunity on Plaintiff's free exercise and RLUIPA claims. The COVID-19 pandemic was the single greatest global health threat in living memory. Millions upon millions of people died, and many more are experiencing lasting complications from the disease. Plaintiff has not identified a case holding that depriving inmates of group religious worship services during the COVID-19 pandemic, to prevent the spread of the disease and to ensure the safety and security of inmates and guards where staffing levels were dangerously low, violated the Free Exercise Clause or RLUIPA. *See Sharp*, 871 F.3d at 911. Nor has the Court found such a case that would place the question "beyond debate." *Kisela*, 584 U.S. at 104.

A few cases from a few courts have permitted such claims to survive a motion to dismiss or initial screening (as the Court did in this case). *See, e.g., Newberg v. Wellpath Recovery Sols.*, No. 2:20-CV-646-JLB-NPM, 2024 WL 4212970, at *12 (M.D. Fla. Sept. 17, 2024) (unpublished) ("The case may … proceed under both the First Amendment and the RLUIPA against Wellpath Recovery Solutions, LLC on the policy claim relating to the post-COVID reduction in worship times at the [civil commitment center]."); *Riggs v. Davis*, No. 3:24-CV-00443-ART-CLB, 2025 WL 3222501, at *7 (D. Nev. July 17, 2025) (unpublished) ("Plaintiff alleges that all religious meetings were canceled …. Although Plaintiff does not acknowledge as much in the [complaint], the Court recognizes that this time period coincides with the COVID-19 pandemic. Whether or not [defendant] will establish that these alleged restrictions were justified under the applicable standards for

Free Exercise and/or RLUIPA claims is a question for later in the case. At this stage, however, Plaintiff has adequately alleged that these restrictions substantially burdened his religious exercise."); *Rouse v. Whitmer*, No. CV 20-12308, 2022 WL 2525434, at *8 (E.D. Mich. June 13, 2022) (unpublished) ("While preventing the spread of COVID-19 … is certainly a compelling state interest, … Defendants fail, at least at the dismissal stage, to meet their heavy burden of showing that the challenged restrictions are the least restrictive means of advancing that compelling interest.") (internal quotation marks and citation omitted), *report and recommendation adopted*, No. 20-CV-12308, 2022 WL 2517241 (E.D. Mich. July 6, 2022).

But these cases say nothing about whether—prior to August 2023—it was clearly established that an inmate has a right to group worship during a dangerous global pandemic while housed in a crowded prison with insufficient staffing levels. It would not have been clear to every reasonable prison official, in the particular circumstances Defendants faced, that the conduct was unlawful. *See Minkosky v. Gladieux*, No. 1:22-CV-00300-SLC, 2025 WL 785829, at *5 (N.D. Ind. Mar. 11, 2025) ("[A] reasonable jury could conclude that the jail's conduct of temporarily halting group worship services during the COVID-19 pandemic was reasonably related to a legitimate penological interest [for purposes of free exercise claims] and was the least restrictive means of serving a compelling governmental interest [for purposes of RLUIPA claims] to limit the spread of the COVID-19 virus through the jail facility.").

The Court concludes that a reasonable officer in Defendants' position could have concluded that banning group religious services, beginning early in the pandemic and

continuing until August 2023, did not violate Plaintiff's religious rights under the Free Exercise Clause or RLUIPA. *See Hunter*, 502 U.S. at 227 ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks omitted). Thus, Defendants are entitled to qualified immunity on these claims.

### F.    Plaintiff's RLUIPA Claims in Defendants' Individual Capacities Are Noncognizable

Although RLUIPA provides for injunctive relief, the statute "does not authorize suits against a person in anything other than an official or governmental capacity." *Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014). The statute also does not permit monetary damages against state officials like Defendants. *Sossamon*, 563 U.S. at 280. Therefore, Plaintiff's RLUIPA claims against Defendants in their individual capacities are not cognizable—meaning they cannot be maintained—and Defendants are entitled to summary judgment on those claims on this basis as well.

### G.    All of Plaintiff's Claims for Monetary Damages Are Barred by State Sovereign Immunity

States and state entities are immune from suit in federal court under the Eleventh Amendment. *Hans v. Louisiana*, 134 U.S. 1, 16–18 (1890); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Neither § 1983 nor RLUIPA constitutes a waiver of Eleventh Amendment Immunity. *Quern v. Jordan*, 440 U.S. 332, 342–44 (1979); *Sossamon*, 563 U.S. at 280. And the Court has found no authority suggesting that the State of Idaho itself has waived its sovereign immunity and consented to be sued in federal court under § 1983, RLUIPA, or FERPA.

In addition to prohibiting claims against state entities in federal court, the Eleventh Amendment also bars claims for monetary damages against state employees if liability on the claims would "be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *abrogated on other grounds as stated in Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63 n.4 (1989). The Idaho Tort Claims Act provides that the State of Idaho is "responsible for the payment of any judgment on any claim or civil lawsuit against an employee for money damages arising out of any act or omission within the course and scope of his employment." Idaho Code § 6-903(2)(i).

Defendants are all employees of the IDOC, which is an arm of the state for purposes of Eleventh Amendment immunity. *Leer v. Murphy*, 844 F.2d 628, 632 (9th Cir. 1988) ("[T]he department of corrections [is] 'an executive department of the state government' under the Idaho Constitution.") (quoting Idaho Code § 20-201). And Defendants' decision to close the prison chapel and the OWA during the pandemic was plainly made within the course and scope of their state employment. Accordingly, because any monetary damages on Plaintiff's claims "would have to be paid out of the state treasury," *id.*, all of Plaintiff's damages claims are barred by the Eleventh Amendment.

> ### H. *All of Plaintiff's Claims for Injunctive Relief with Respect to the Total Ban on Inmate-Led Group Worship Services from June 2020 to August 2023— under the Free Exercise Clause, RLUIPA, and FERPA—Are Moot, and the Court Cannot Issue Injunctive Relief on Plaintiff's Federal Claims Because There Is No Ongoing Violation of a Federal Right as Required by 18 U.S.C. § 3626*

Defendants argue that Plaintiff's remaining injunctive relief claims are moot because the total ban on group worship services was lifted in August 2023. It is undisputed

that KOE is now permitted to use the chapel for one hour and fifty minutes per week and the OWA for two hours and fifty minutes per month. As explained above, Plaintiff cannot show that this presently constitutes a substantial burden on Plaintiff's religious exercise.

Ordinarily, a case in which a plaintiff seeks injunctive relief does not become moot merely because a defendant voluntarily stops engaging in the allegedly illegal conduct—if it did, then a "defendant [would be] free to return to his old ways" at a later date. *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (internal quotation marks omitted). To overcome this general rule that voluntary cessation of allegedly unconstitutional conduct does not moot a case, the party asserting mootness faces a "stringent" burden. *Id*. A mere statement that the defendant will not resume the conduct is insufficient. Rather, the party claiming mootness must show that "the allegedly wrongful behavior could not reasonably be expected to recur," such that "the likelihood of further violations is sufficiently remote to make injunctive relief unnecessary." *Id*.

Moreover, in cases subject to the Prison Litigation Reform Act of 1996 ("PLRA"), a Court may not grant injunctive relief unless there is a *current and ongoing* violation of a constitutional or statutory right. *Balla*, No. 1:81-CV-1165-BLW, 2020 WL 2812564, at *7 ("If a court finds no current and ongoing violation of 'the Federal right,' the inquiry ends.") (quoting 18 U.S.C. § 3626(b)(3)). A court may not issue injunctive relief under § 3626 if there is no ongoing constitutional violation. In such a case, the defendant's voluntary cessation of the allegedly illegal conduct means there is no such violation, and the PLRA prohibits injunctive relief.

Defendants have satisfied their stringent burden of showing that the total restriction on group worship imposed during the COVID-19 pandemic cannot reasonably be expected to occur again. The ban was implemented because of the unprecedented threat of COVID-19. There is simply no evidence suggesting that another dangerous global pandemic is likely to occur, and Plaintiff has not established a genuine dispute of material fact as to whether the total restriction is reasonably likely to recur.

Therefore, all of Plaintiff's claims for injunctive relief are moot. Moreover, because there is no current and ongoing violation of Plaintiff's right to religious exercise, the Court would be unable to issue injunctive relief on Plaintiff's federal claims under the PLRA in any event.

## CONCLUSION

For the foregoing reasons, the Court concludes as follows: (1) Plaintiff's claims arising before September 27, 2021 are untimely; (2) Plaintiff cannot show that he was removed as the KOE facilitator on account of protected activity or that his removal was not reasonably related to a legitimate penological interest; (3) Plaintiff's free exercise, RLUIPA, and FERPA claims with respect to the period of time from August 2023 to the present fail because Plaintiff cannot show that the amount of time available for KOE groups worship constitutes a substantial burden on Plaintiff's exercise of religious beliefs; (4) Plaintiff cannot show that any of the restrictions on groups services are not reasonably related to legitimate penological interests for purposes of Plaintiff's free exercise claims; (5) Defendants are entitled to qualified immunity on Plaintiff's free exercise and RLUIPA claims; (6) Plaintiff's RLUIPA claims in Defendants' individual capacities are not

MEMORANDUM DECISION AND ORDER - 40

cognizable; (7) Plaintiff's claims for monetary damages are barred by the Eleventh Amendment; and (8) Plaintiff's claims for injunctive relief are moot. Accordingly, Defendants are entitled to summary judgment.

## ORDER

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Dkt. 22) is GRANTED, and judgment will be entered in favor of Defendants.

DATED: January 21, 2026

David C. Nye
U.S. District Court Judge